UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:08CR390CAS(MLM) |
| ) | |
| TERESSA V. SHRUM, ) | |
| ) | |
| Defendant. ) | |

# REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the court on defendant Teressa Shrum's Motion to Suppress Evidence. [Doc. 25] The government responded. [Doc. 27] An Evidentiary Hearing was held on August 26, 2008. The government presented the testimony of Special Agent Christopher Clark. Defendant testified on her own behalf and presented the testimony of Dr. Michael Mullins. Following the Hearing the parties requested and were given an opportunity to brief the issues raised by Dr. Mullins' testimony. The government responded in opposition. [Doc. 31] Defendant replied. [Doc. 32] Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses in addition to having considered the arguments of the parties, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

As background, the Indictment in this case charges defendant with twenty counts of Theft of Government Property. Basically, the Indictment alleges that co-defendant Steven Brown was employed by the United States Department of Defense ("DoD") as a purchasing agent. Co-defendant Brown conducted numerous DoD credit card transactions with defendant Shrum in which defendants received money but DoD did not receive any

goods or services. The Indictment further charges that defendant Shrum used a business she owned and operated called Infiniti Business Solution ("IBS") to conduct these illegal transactions with DoD.

SA Christopher Clark testified that at the time of the interview which is at issue in this case, he was an administrative investigator with the National Geospatial-Intelligence Agency ("NGA"). He said that on October 18, 2007, he and SA Stephen Manley of the DoD were investigating suspicious credit card activity in the amount of approximately $280,000.00. This activity concerned purchases from IBS made by co-defendant Steven Brown with his DoD purchase card.

On 10/18/07 at approximately 9-9:15 a.m., SA Clark and SA Manley went to the residence of defendant Shrum in Hannibal, Missouri (where IBS was located). They knocked on the front door, waited 2-5 minutes and having received no answer, went around to the back door. They knocked and defendant answered. They identified themselves as government agents and showed her their credentials. SA Manley told her the purpose of their visit was to inquire about credit card purchases from IBS. She agreed to speak to the agents and asked them to come inside. She was dressed in an oversized t-shirt and sweat pants consistent with having just awakened. No promises or threats were made by either of the agents to induce her to speak to them. She did not say anything about wanting or having a lawyer and the agents did not know if she had a lawyer at the time. At no time did she object to their questions. They were at her house approximately 3-1/2 hours. During that time defendant sometimes sat in a recliner; the agents sat on the couch. She went to the restroom and spoke to her husband on the phone. She got a phone call and made a phone call and went outside to meet her husband in the parking lot. At some point she

drove her car to the office to make copies of documents she wanted to give to the agents. They followed her in their car. At no time was she handcuffed or restrained in any way; she had complete freedom of movement. The agents did not yell or raise their voices; she even asked them questions. They did not use deceptive interview tactics. There was no talk of jail; the agents did not threaten to ruin her son's musical career; in fact, they did not even know he was musician until she told them. They asked her for receipts given by IBS. She said the receipts were in the packing boxes which were scattered about the residence. She did have some receipts which co-defendant Brown had signed. She showed the agents exculpatory receipts of what appeared to be legitimate business transaction between IBS and DoD. In addition, she said she was being evicted and was moving to another address. She did not seem distressed about moving, however she was unhappy with her landlord over remodeling the kitchen. As noted, her residence appeared full of packing boxes as if she was ready to move.

Agent Clark described her demeanor: her hands were not shaking; she was upbeat, cordial and relaxed; she was not sweating or slurring her words. She occasionally laughed and when she walked and moved, her gait was completely normal. They observed her drive her car when she went to make the copies and she drove reasonably well without weaving. She was capable of answering questions. She did not appear intoxicated or under the influence of drugs. She volunteered that she was under the care of a doctor for fertility problems. She did not mention anxiety or the traumatic deaths of family members or having had a miscarriage. The agents did not ask her if she had taken any medication or alcohol and she did not indicate that she had. They did not ask her level of education.

She described her relationship with co-defendant Brown: she said he would call or e-mail her and tell her what make and model computer he wanted and then she would go

on the Internet and buy what he wanted. She said she first met Brown in 2004 and they kept in touch and would occasionally go out for dinner. She acknowledged that it was not typical of DoD purchasing agents to buy items from their friends. She also volunteered that her work background included working as an exotic dancer and posing nude for Hustler magazine.[1] She said she was in the process of converting to Catholicism and becoming a "spiritualist."

The agents received a call from other agents who were interviewing co-defendant Brown and they told defendant Shrum that co-defendant Brown had confessed. Defendant Shrum repeatedly said she had done nothing wrong and tried to justify her conduct. The agents indicated they did not believe her. They explained the benefits of being honest. On cross-examination Agent Clark was questioned at length about their tactics. He denied mentioning any negative repercussions and denied saying she could go to jail if she did not cooperate. He denied saying her son would not want to see her go to jail.

Defendant Shrum voluntarily testified on her own behalf after having reviewed the pros and cons of testifying with her lawyer. She said she was not under the influence of medications the day of the hearing and indicated she is 33 years old and resides in Hannibal, Missouri. She testified that she recalled generally that two agents came to her house and interviewed her. The day the agents came to her house she took Lorazepam and Amitriptyline. The Lorazepam prescription expired 9/16/98 and the Amitriptyline prescription expired 2/08/01. She described her symptoms and reasons for taking the

---

[1] In the context of answering a question of whether her IBS records included tax records, she likened it to being an independent contractor like when she was an exotic dancer and would give her accountant all of her bills and statements at the end of the year.

medicine as "I can't have a life" and "I need something." She said she took the Amitriptyline when she felt she had too much going on and the stress and pressure were too much. A couple of months before she had taken both prescriptions together and said "It puts me pretty much out of it."

She testified that she took the pills that particular day (of the interview) because she had been evicted and she was packing not only her own things but those of her recently deceased grandmother and uncle. She said her Uncle John committed suicide ten days after her grandmother passed.

She did not recall any details of the interview. She did not recognize Agent Clark. She did recall some discussion about jail and her son but she did not recall what happened when the agents were at her door nor did she recall whether she thought she could stop talking to them.

On cross-examination she responded affirmatively when she was asked if she thought her doctor wanted her to keep taking the pills which had been prescribed ten years before. She said she had carried the pill bottles with her every time she changed addresses. She said there were actually three prescriptions: the Lorazepam bottle contained both large and small doses and she had taken the large pill. She admitted seeing a doctor for fertility treatments and not telling the doctor she was taking the pills. She said she took the pills around 7:00 a.m. on the day of the interview. She further testified she did not recall the agents threatening her and admitted that testifying was more stressful than talking to the agents in her living room. She also admitted driving her car to the office to make copies of documents for the agents.

Defendant also presented the testimony of Dr. Michael Mullins. He is employed by Washington University School of Medicine and is an Attending Emergency Room doctor and a medical toxicologist.[2] He has testified before in both federal and state court and in military courts martial. He described his career and presented his CV. Def.Ex. 3. He said he was contacted by defendant's attorney's office on 8/12/08 and was asked to interview defendant. He said he interviewed defendant Shrum for 1.1 hours and took notes of the interview. Def.Ex. 4. He said defendant told him she took one milligram of Lorazepam at 7:00 A.M. and an unknown dose of Amitriptyline at approximately 10:00 A.M.

Lorazepam is an oral anti-anxiety medication.[3] Lorazepam comes in different doses. A typical starting dose is .5 milligrams and it can go up to 1 milligram and even 2 milligrams. A tolerance develops if one takes it repeatedly. After taking it, one experiences relief from anxiety. Amitriptyline is primarily an anti-depressant but it can also be used for pain management. It acts on the brain to block the re-uptake of norephedrine and serotonin. Amitriptyline comes in dosages of 10 milligrams up to 150 milligrams. Lorazepam and Amitriptyline work on different receptors in the brain. Amitriptyline improves mood and Lorazepam is calming.

Dr. Mullins was presented with the following scenario: (1) a person was interviewed by law enforcement but does not recall much of it; (2) the interviewers report the person was upbeat; (3) the person allowed the law enforcement officers into her house and

---

[2] A medical toxicologist studies the clinical effects of chemicals. In addition to his other credentials, from 1997 to 1999 Dr. Mullins took a two year fellowship in medical toxicology at the University of Oregon.

[3] Lorazepam can also be administered interveinously. It is used to treat seizures and to relax patients for painful procedures such as setting fractures. In this form it tends to render a patient more compliant for the procedure and produces mild amnesia.

submitted to an interview; and (4) the person was not nervous, sweating or concerned. He was asked if that scenario is consistent with the person having taken Lorazepam and Amitriptyline. He answered that it was most consistent with having taken Lorazepam. He also said that Lorazepam renders a person compliant and less likely to refuse a request or recognize a danger.

In addition, he said it is not uncommon for patients to carry prescriptions prescribed years before; the age of the pills would not effect their stability or effectiveness; operating a vehicle is within the realm of possible activities taking Lorazepam and Amitriptyline and one would have no intoxication-like visible effects after taking Lorazepam and Amitriptyline.

On cross-examination Dr. Mullins admitted he had no doctor/patient relationship with defendant; he only saw her once for 1.1 hours; he did not review her medical records or pharmacy records; regarding the date of the interview, he did not see blood or urine tests; he only knew the facts defendant told him; he would not embark on a treatment plan without more than a person's subjective complaints; sometimes patients give inaccurate histories; and some patients use Lorazepam and Amitriptyline regularly and lead normal lives with normal functioning. Dr. Mullins also said there was no evidence that defendant was "intoxicated" which he defined as having taken an excessive amount such that there were toxic effects. As far as he was able to discern she took a normal amount of the drugs and was under their influence to the extent he described.

## CONCLUSIONS OF LAW

Defendant challenges the interview on 10/18/07 on two grounds: One, the agents coerced and threatened defendant to the extent that it amounted to constructive restraint

and custodial interrogation; and two, defendant's use of prescription drugs prevented her from withholding consent to the agents for the interview.

**1.      Constructive Restraint and Custodial Interrogation**

Custody occurs either upon formal arrest or any other circumstances in which the suspect is deprived of his freedom of action in any significant way. Miranda v. Arizona, 384 U.S. 436, 444 (1966); Berkemer v. McCarty, 468 U.S. 420, 429 (1984). The extent of the physical or psychological restraints placed on defendant must be examined in light of whether a "reasonable person in the suspect's position would have understood the situation" to be one of custody. Berkemer, 468 U.S. at 442. The determination of custody arises from an examination of the totality of the circumstances. United States v. Carter, 884 F.2d 368, 370 (8th Cir. 1989), citing United States v. Lanier, 838 F.2d 281, 285 (8th Cir. 1988) (per curiam).

The Eighth Circuit has set out certain indicia of custody which, while not exhaustive, are influential in the court's assessment of the totality of the circumstances:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990).

The Griffin court characterizes the first three factors as "mitigating factors, that is to say the affirmative presence of one or more of these factors during questioning would

tend to mitigate the existence of custody at the time of questioning." Id. On the other hand, "the remaining three factors may be characterized as coercive factors, which is to say that the affirmative presence of one or more of these factors during questioning would tend to aggravate the existence of custody." Id. The court has specifically directed that "it is not necessary to a finding of custody that all of the foregoing indicia be presented by the factual circumstances of a case (citation omitted) and a particularly strong showing with respect to one factor may compensate for a deficiency with respect to other factors." (citation omitted). Griffin, 922 F.2d at 1349.

The chief concern is with the accused's subjective belief that "his freedom of action is curtailed to a degree associated with formal arrest," Berkemer, 468 U.S. at 439, and whether that belief is objectively reasonable under the circumstances. Id.; Griffin, 922 F.2d at 1349.

When a person is questioned in the comfort of her own home, courts are far less likely to find the circumstances custodial. United States v. Axsom, 289 F.3d 496, 502 (8th Cir. 2002).

In the present case defendant testified she has little recollection of the interview. She did not know whether any threats were made. The only evidence before the court about what happened at the interview is Agent Clark's testimony. He testified specifically that no promises or threats were made. The agents identified themselves and explained their purpose. Defendant invited them inside and did not object to their questions. During the time they were in defendant's house, she moved about, went to the restroom, made at least two phone calls and received a call. She spoke to her husband, met him in the parking lot and obtained documents from him. She drove her own car to the office to make copies

of documents for the agents. She was not arrested at the termination of the interview. Clearly, her freedom of action was not curtailed.

The undersigned finds that a reasonable person under the circumstances stated above would not believe that she was under arrest or that she was not free to leave. The facts show that the interview was not a custodial interrogation and that the statement made by defendant was voluntary. She was not threatened or coerced in any manner. Because the statement was non-custodial, the Miranda warnings need not have been given. Berkemer v. McCarty, 468 U.S. 420 (1984); Beckwith v. United States, 425 U.S. 341 (1976). That the defendant may have been a suspect in this crime does not trigger any right on her part to be given the Miranda warnings. California v. Beheler, 463 U.S. 1121 (1983).

2. **Prescription Medication**

As set out at length above, defendant says she took one Lorazepam and one Amitriptyline. Her witness, Dr. Mullins, testified that one each of the pills is within the typical recommended dosage range. He opined that these drugs could make her more compliant and cause mild amnesia. Lorazepam (for anxiety) is a Schedule IV drug under the Controlled Substances Act and Amitriptyline (for depression) is not scheduled. Dr. Mullins admitted that many people take these drugs on a regular basis and that after doing so lead healthy and productive lives.

Dr. Mullins' basis for his opinions was one interview that lasted approximately one hour. He did no tests, did not do a physical exam or obtain any medical or pharmacy records. He said the information he had would be insufficient for him to make a diagnosis or form a treatment plan. He simply listened to defendant's version of the events and had no objective information on which to rely. Using this limited and unreliable factual basis, Dr. Mullins offered opinions about the possibility that the drugs could have impaired

- 10 -

defendant's ability to consent or that her consent could have been "consistent with" the effects of the prescription drugs she may have taken that day.

As an initial matter, a doctor can not reach medical opinions by relying solely on a patient's allegations. An opinion based solely on a patient's oral history is nothing more than the patient's testimony "dressed up and sanctified." United States v. Whitted, 11 F3d 782, 786 (8th Cir. 1993), citing Viterbo v. Dow Chem. Co., 826 F.2d 420, 424 (5th Cir. 1987).

Questions of voluntariness and consent are primarily legal issues - - not medical issues - - and expert testimony on legal issues does not assist the fact-finder. Yannacopoulous v. General Dynamics Corp., 75 F.3d 1298, 1302 (8th Cir. 1996) (excluding lawyer's letter concluding that contract existed); Specht v. Jensen, 853 F.2d 805, 807-09 (8th Cir. 1980)(attorney's expert opinion that effective consent for search was not given ruled inadmissible), and cases cited therein.

In the present case, defendant consented to allowing the agents into her home and to talking to them. There is no evidence that she did not consent to a search - - in fact the agents did not search her residence. Any documents they seized were copied and given to them by defendant. Although the issue of consent is usually analyzed in the concept of a search, the Chaidez factors can appropriately be applied to whether her consent to the agents' entry and interview was voluntary.

A consent is voluntary if it is "the product of an essentially free and unconstrained choice by its maker," Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973), rather than "the product of duress or coercion, express or implied." Id. at 227. The defendant's awareness of the right to refuse is not necessary for a consent to be voluntary. Id. at 234-35; United States v. Heath, 58 F.3d 1271, 1275-76 (8th Cir.) (prosecution need not prove defendant was

fully aware of rights under Fourth Amendment in order to establish voluntariness of consent), cert. denied, 516 U.S. 892, 116 S.Ct. 240 (1995); United States v. Barahona, 990 F.2d 412, 417 (8th Cir. 1993); United States v. Boyer, 988 F.2d 56, 57 (8th Cir. 1993) (defendant's lack of knowledge that he could withhold consent does not invalidate search); United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990). Further, the voluntariness of a consent is a question of fact to be determined from the totality of the circumstances. Bustamonte, 412 U.S. at 277.

"In assessing voluntariness courts look both to the characteristics of the accused and the details of the environment." United States v. Miller, 20 F.3d 926, 930 (8th Cir.), cert. denied, 513 U.S. 886, 115 S.Ct. 226 (1994). The following are relevant to this determination:

> The age of the defendant; his general intelligence and education; whether he was under the influence of a mind-altering substance; whether he was informed of his right to withhold consent or of his Miranda rights; the length of time he was detained and questioned; whether he was threatened, physically intimidated, or punished by the police; whether he relied upon promises or misrepresentations made by the police; whether he was in a public or secluded location; and whether he objected to the search or passively looked on. Chaidez, 906 F.2d at 381 (citations omitted).

United States v. Barahona, 990 F.2d at 417; United States v. Armstrong, 16 F.3d 289, 295 (8th Cir. 1994). The factors are not to be mechanically applied but rather are "valuable as a guide to analysis." Chaidez, 906 F.2d at 381. In the present case, defendant is 33 years old and she certainly has the intelligence and education sufficient to run her own business. She had no right to be advised of Miranda warnings because the questioning was not custodial. She was questioned for 3-1/2 hours in her own home. She was not threatened, physically intimidated or punished by the police. The agents made no promises or misrepresentations to her. She did not object to answering questions by the agents. There

is no evidence, except the issue of her mental state due to the alleged Lorazepam and Amitriptyline, that she was unable to withhold consent.

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." Colorado v. Connelly, 479 U.S. 157, 163 (1986).[4] Whether one is addressing the voluntariness of consent or of a confession/statement[5] the analysis is the same: "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." Id. at 164. There is no question that the mental condition of the defendant is a significant factor in the voluntariness calculus. Id. But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness'". Id. "[W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." Id. at 165. The Supreme Court's "'involuntary' jurisprudence is entirely consistent with the settled law requiring some sort of 'state action' to support a claim of violation of the Due Process Clause of the Fourteenth Amendment." Id. There is therefore an essential link between coercive police activity and a resulting confession of a defendant. Id. Succinctly put: "We

---

[4] The Connelly case is the seminal case for the analysis of constitutional voluntariness. In Connelly a man approached the police and having been advised of his Miranda rights confessed to a murder. It was later determined that the man suffered from a psychosis that interfered with his ability to make free and rational choices and although not preventing him from understanding his rights, motivated his confession. The trial court suppressed his confessions because they were "involuntary". The Supreme Court reversed.

[5] The concept of a "confession" is broad and can include any statement made by a defendant.

hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Id.

The test of voluntariness of one who claims intoxication at the time of making a statement is "whether the individual was of sufficient mental capacity to know what he was saying - - capable of realizing the meaning of his statement - - and that he was not suffering any hallucinations or delusions." Rucker v. Norris, 2008 WL 687374 (Ed.Ark.) quoting McDougald v. State, 748 SW2d 340 (Ark. 1988). "[T]he mere fact that one has taken drugs, or is intoxicated, or mentally agitated does not render consent involuntary. In each case, '[t]he question is one of mental awareness so that the act of consent was the act of one who knew what he [or she] was doing and a had a reasonable appreciation of the nature and significance of his [or her] actions.'" United States v. Sanders, 2007 WL 1490483, *4 (D.Neb. 2007) (quoting United States v. Rambo, 789 F.2d 1289, 1297 (8th Cir. 1986) (consent to search voluntary despite use of cocaine) (internal citations omitted); see United States v. Annis, 446 F.3d 852, 855 (8th Cir. 2006) (pain from injuries combined with methamphetamine withdrawal did not make voluntary or knowing waiver impossible when defendant did not appear to be in pain or suffering from withdrawal, made no complaints and answered questions reasonably); United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (statement not involuntary due to intoxication when effects of alcohol had worn off and defendant did not appear intoxicated); United States v. Gipp, 147 F.3d 680, 686 (8th Cir. 1998) (consent to search voluntary despite use of marijuana); United States v. Turner, 157 F.3d 552, 555-56 (8th Cir. 1998) (valid waiver of rights despite intoxication with PCP); United States v. Martin, 28 F.3d 742, 746 (8th Cir. 1994) (statements voluntary despite use of methamphetamine).

A defendant's claim of intoxication has been used before to challenge the voluntariness of a confession. "The Eighth Circuit Court of Appeals has repeatedly declined to adopt a per se rule of involuntariness when confronted with claims of intoxication and/or fatigue. See United States v. Makes Room, 49 F.3d at 415. The test is whether these mental impairments cause a defendant's will to be overborne. United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990)." United States v. DeWitt, 2001 WL 34149270, *4 (N.D.Iowa, 2001).

> Where the defendant was coherent, composed and cooperative, confessed and cooperated quickly, and there was no substantial police coercion, the Eighth Circuit Court of Appeals has repeatedly rejected voluntary drug intoxication as a reason to suppress a statement as involuntary. United States v. Byrne, 83 F.3d 984, 989 (8th Cir. 1996); . . . Makes Room, 49 F.3d at 415; United States v. Magness, 69 F.3d 872, 874 (8th Cir. 1995); United States v. Martin, 28 F.3d 742, 745 (8th Cir. 1994); United States v. Bordeaux, 980 F.2d 534, 538-39 (8th Cir. 1992); . . . Casal, 915 F.2d at 1229.

Id.

In the present case, Agent Clark testified defendant was calm and coherent during the interview. She answered questions appropriately. Her gait was normal as she walked about and went to the restroom and there no other visible indications that she may have been under the influence of drugs. Although defendant claims little memory of the interview she does not dispute that she called her husband to obtain the business records, that her husband came to the house with the records, that she walked outside to the parking lot and obtained the records from her husband, that her husband left and made no attempt to stop the interview or otherwise assist her or that she drove herself to a nearby office, copied documents and provided them to the agents and drove back home.

Gov.Ex.1, SA Manley's report of the interview, has as attachments the records defendant provided. They are exculpatory in nature showing that the government actually

signed for and received computer equipment from her after credit card transactions would go to defendant Brown. These undisputed facts show logical and thoughtful action by defendant and are inconsistent with intoxication or mental impairment from drugs. The extensive report of the interview in Gov.Ex.1 shows her repeated attempts to justify her behavior. She was thinking clearly enough to attempt to exculpate herself which is inconsistent with having her will overborne or being intimidated by the agents. Her consent to the agent's entry and her statements during the interview were voluntary under the totality of the circumstances and should not be suppressed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that defendant's Motion to Suppress Evidence be **DENIED**. [Doc. 25]

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this   7th   day of October, 2008.